UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MANDAN, HIDATSA AND ARIKARA NATION**,<br><br>Plaintiff,<br><br>v.<br><br>**THE UNITED STATES DEPARTMENT OF THE INTERIOR; RYAN ZINKE**, in his official capacity as Secretary of the United States Department of the Interior,<br><br>Defendants,<br><br>**SLAWSON EXPLORATION COMPANY, INC.**,<br><br>Intervenor-Defendant. | Case No. 18-cv-1462 (CRC) |

## MEMORANDUM OPINION AND ORDER

This case concerns the Bureau of Land Management's ("BLM") approval of permits for Slawson Exploration Company, Inc. ("Slawson"), to drill horizontal oil and gas wells underneath Lake Sakakawea in North Dakota. The well pad is located 600 feet from the lake on privately-owned "fee" land within the Fort Berthold Indian Reservation, which is where Plaintiff Mandan, Hidatsa and Arikara Nation ("MHA Nation" or "Tribe") resides. The Tribe brought this lawsuit against the U.S. Department of the Interior and its now-former Secretary Ryan Zinke ("federal defendants") to challenge the issuance of the drilling permits. It says the BLM's decision to approve the permits violated a tribal law requiring that all well sites be at least 1,000 feet from the lake. Slawson, as it did in the administrative proceedings, intervened as a defendant.

Slawson, joined by the federal defendants, has moved to transfer the case to the District of North Dakota—where the land in question and the relevant BLM decisionmakers are

located—arguing that the case presents an entirely local dispute with no meaningful connection to the District of Columbia.  The Tribe opposes the motion.  For the reasons that follow, the Court will grant the motion and transfer the case to the District of North Dakota.

I. **Background**

In 1953, the federal government completed construction of the Garrison Dam along the Missouri River in central North Dakota.  Compl., ECF No. 1, ¶ 19.  The erection of the dam created Lake Sakakawea, a 180-mile long reservoir that runs through the Fort Berthold Indian Reservation.  Id.  The reservation is home to the Mandan, Hidatsa and Arikara Nation, a federally-recognized tribe.  Id. ¶¶ 11, 14.

BLM, an agency of the Department of the Interior, administers federal oil and gas leases.  In 2011, Slawson applied to the BLM's North Dakota Field Office for permits to drill multiple horizontal wells underneath Lake Sakakawea.  Id. ¶ 41.  The wells share a common well pad on privately-owned, non-Indian "fee" land approximately 600 feet from the shore.  Id. ¶¶ 42–43.  (Fee land is property that is individually owned rather than held by the federal government in trust for Indian tribes.)  According to Slawson, the well bores will penetrate mineral beds held either by the federal government, the State of North Dakota, or private entities.  They will not reach minerals held by, or in trust for, the Tribe.  See Slawson's Motion to Transfer ("MTT"), Exhibit A (Environmental Assessment), ECF No. 18-2, at 1; MTT, Exhibit B (Decl. of Eric Sundberg), ECF No. 18-3, ¶ 4.  The BLM's North Dakota Field Office analyzed the potential impact of Slawson's proposed project as required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and, in March 2017, published an Environmental Assessment, a Finding of No Significant Impact, and a Decision Record.  Compl. ¶ 49.  The office approved the project and granted the permits.  Id.

The MHA Nation sought administrative review of this decision with BLM's Montana-Dakotas State Director. Id. ¶ 50. It argued that the location of the well pad violated a tribal resolution passed in February 2017 that imposed a 1,000-foot setback requirement on all wells near the lake regardless of whether the land was held in fee or owned by, or in trust for, the Tribe or its members. Id. The Tribe also argued that the location of the well pad conflicted with the BLM's own resource management plan, which applies to the development of federal minerals in North Dakota, id. ¶ 28, the Army Corps of Engineers' management plan for Lake Sakakawea, id. ¶ 33, and the Bureau of Indian Affairs' programmatic biological assessment and evaluation for oil and gas development in the Fort Berthold Reservation, id. ¶ 37. See id. ¶ 50. In April 2017, the State Director affirmed the Field Office's decision to issue the permits. Id. ¶ 51. The affirmance was grounded on a finding that the BLM was not bound by the Tribe's setback law because the permits in question were for use on privately-owned fee land, not land owned by the Tribe or its members, and that the Tribe thus lacked civil jurisdiction over Slawson under the Supreme Court's decision in Montana v. United States, 450 U.S. 544 (1981). See MTT, Exhibit F (BLM State Director Decision), ECF No. 18-7, at 4–5.

The Tribe then filed a Notice of Appeal and Petition for Stay with the Interior Board of Land Appeals ("IBLA"). Compl. ¶ 52. As it did here, Slawson intervened. Id. In August 2017, an administrative judge from the IBLA issued an order staying the effectiveness of Slawson's permits pending review of the merits of the Tribe's appeal. Id. ¶ 53.

In response, Slawson turned to the District of North Dakota for an injunction preventing the IBLA from enforcing the stay. Id. ¶¶ 54–55. The district court entered a temporary restraining order ("TRO") against the stay in August 2017, which allowed Slawson to continue

drilling, id. ¶ 56, and in November 2017, it extended the TRO into a preliminary injunction and denied the Tribe's motion to dismiss, id. ¶ 60.

In the meantime, the BLM and Slawson asked the Director of the Department of the Interior's Office of Hearings and Appeals (the "Director") to take jurisdiction over the Tribe's appeal, which was still pending before the IBLA administrative judge. Id. ¶ 62. The Director agreed to do so in October 2017, id. ¶ 63, and, after the District of North Dakota issued its final order, determined in March 2018 that the IBLA should not have issued the stay order, id. ¶ 66. The Director then proceeded to the merits of the Tribe's appeal and, relying substantially on the District of North Dakota's TRO decision, concluded that the BLM had properly approved Slawson's permit applications. Id. ¶ 68.

The Tribe asks this Court to review the decision affirming the BLM's approval of the permits. See Compl. (filed June 20, 2018). It argues that the "BLM was required to apply the MHA Nation's setback law to [Slawson's proposed] Project, and under that law, it was required to deny" the permits. Id. ¶ 72. The Tribe contends that the agency was required to apply the setback law for three main reasons: (1) the law was enacted pursuant to the Tribe's federally-approved constitution; (2) the law was enacted pursuant to the Tribe's inherent sovereign authority to protect the health and welfare of the Tribe; and (3) "the United States has a trust duty and a treaty duty to apply and enforce the Tribe's laws." Id.

Both Slawson and the federal defendants have moved to transfer this case to the District of North Dakota. The Tribe opposes the motion.

II. **Legal Standard**

District courts have discretion to transfer a case to another venue "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Courts assess motions

4

to transfer according to an "individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (citation omitted). The moving party bears the initial burden of establishing that transfer is proper. City of W. Palm Beach v. U.S. Army Corps of Eng'rs, 317 F. Supp. 3d 150, 153 (D.D.C. 2018) (citation omitted).

First, the moving party must establish that the plaintiff could have brought its suit in the transferee forum, here North Dakota. 28 U.S.C. § 1404(a). The Tribe does not dispute that it could have brought this suit in the District of North Dakota because "a substantial part of property that is the subject of the action is situated" there. Id. § 1391(e); see generally Opp'n, ECF No. 27.

Next, the moving party must demonstrate that both private convenience factors and public interest factors, taken together, weigh in favor of transfer. Courts generally consider three public interest factors and six private interest factors. The public interest factors are "(1) the transferee forum's familiarity with the governing laws . . . ; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home." City of W. Palm Beach, 317 F. Supp. 3d at 156 (citation omitted). And the private interest factors are "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses . . . ; and (6) the ease of access to sources of proof." Id. at 154 (citation omitted).

### III. Analysis

Slawson urges the Court to transfer the case because the District of Columbia has only an attenuated connection to the Tribe's claims while North Dakota has a clear local interest in them insofar as the land at issue is in North Dakota, the Tribe resides in North Dakota, and it was the

5

BLM's North Dakota Field Office that made the underlying permit decision.  The Tribe counters that venue is proper here and that Slawson cannot overcome the strong presumption favoring a plaintiff's choice of forum, especially because this lawsuit presents legal questions of national importance for all tribes.  The Court concludes that, on balance, the public and private interest factors weigh in favor of transfer.  The Court addresses those factors in turn.

    A.  Public interest factors

Two of the three public interest factors (the public interest in having local controversies decided locally and the transferee court's familiarity with the parties and the issues in this case) weigh in favor of transfer while a third (the relative congestion of the courts) weighs slightly against.

    1.  *Local interests*

"'[P]erhaps the most important factor' in the motion-to-transfer balancing test is the interest in having local controversies decided locally." Alaska Wilderness League v. Jewell, 99 F. Supp. 3d 112, 116 (D.D.C. 2015) (quoting Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 54 (D.D.C. 2012)).  Slawson and the federal defendants paint this dispute as entirely local.  MTT at 18–19; Fed. Defs.' Reply at 1, 3–5.  To advance the point, Slawson emphasizes other cases in which courts in this district have transferred challenges to BLM permitting decisions to the districts in which the agency first made those decisions.  For example, in Intrepid Potash-New Mexico, LLC v. U.S. Department of the Interior ("Intrepid Potash"), 669 F. Supp. 2d 88 (D.D.C. 2009), the court transferred the case to New Mexico because "the land at issue is entirely within New Mexico, and the BLM field office in Carlsbad and the New Mexico state director made the original decisions to approve the drilling applications." Id. at 95.  And in Southern Utah Wilderness Alliance v. Lewis ("SUWA"), 315 F.

6

Supp. 2d 82 (D.D.C. 2004), the court transferred the case to Utah where the "primary issue in this case" was "the BLM Utah state office's proposal to sell the 21 parcels [located in Utah] and the procedures it followed." Id. at 87.  Here, the Tribe challenges the BLM's North Dakota Field Office's approval of permits for drilling on land in North Dakota.  And, as Slawson notes, even the Tribe emphasizes that the land potentially affected—Lake Sakakawea—has local significance:  The lake is a "critical source" of drinking water for the Tribe and the public, is "at the heart of the MHA Nation's religious and cultural identity," and is a place of recreation for North Dakotans.  Compl. ¶¶ 20–21.  This factor would seem, then, to weigh in favor of transfer to North Dakota.

The Tribe disagrees, arguing that this case presents questions of "national importance." Opp'n at 18.  Cases with "national implications" are less likely to "be considered the type of purely 'localized controversy' that would warrant transfer to the local district court." Forest Cty. Potawatomi Cmty. v. United States, 169 F. Supp. 3d 114, 118 (D.D.C. 2016) (quoting Stand Up for Cal. v. U.S. Dep't of the Interior, 919 F. Supp. 2d 51, 64 (D.D.C. 2013)).

The Tribe offers three reasons why this case has national importance: (1) the Missouri River (into which the lake flows) is "a major national waterway" that could be imperiled by an oil spill resulting from Slawson's drilling operations; (2) the unique "government-to-government relationship" between tribes and the United States is "per se, a national issue"; and (3) the Tribe's suit concerns tribal lawmaking authority and the federal government's duty to enforce compliance with those laws pursuant to its trust relationship with tribes.  Opp'n at 18.

The Court need address plaintiff's first and second reasons only briefly.  First, while the Missouri River is undoubtedly a national waterway, this case concerns only Lake Sakakawea and its immediate environs.  And the Tribe fails to explain how a spill resulting from drilling

7

operations in the lake would likely affect sections of the Missouri River beyond those environs, let alone in states other than North Dakota. The case therefore does not implicate the kind of interstate issues that were at play in the case cited by the Tribe challenging the Army Corps of Engineers' operation of the dam and reservoir system on the Missouri River. See Opp'n at 7–8 (quoting Amicus Brief, Am. Rivers v. Army Corps of Eng'rs, No. 03-cv-241-GK, 2003 WL 23781196, ECF No. 26, at 3, 5 (D.D.C. Mar. 28, 2003), in which state amici argued against a motion to transfer the case from the District of Columbia to the District of North Dakota in part because many of the dams and reservoirs were located in states upstream from North Dakota). Second, the Tribe is simply incorrect that any case pitting an Indian tribe versus the United States is necessarily one of national concern. Courts in this district routinely grant motions to transfer cases brought by tribes against the federal government. See Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 25 & 25 n.5 (D.D.C. 2002) (listing cases).

The weight of this public factor really turns on the MHA Nation's third argument concerning national importance. The Tribe insists that this is not a case about "a run of the mill decision to allow an oil and gas well to be drilled," Opp'n at 9, but rather whether the federal government must "condition a permit to drill" on fee land within a reservation "on compl[iance] with the Tribe's substantive laws" pursuant to the "federal trust duties to tribes," id. at 23. The answer to this question, the Tribe says, could have serious implications for other tribes that purport to regulate reservation lands held in fee.

Slawson counters that the Tribe oversells the general applicability of this case by ignoring directly controlling case law. In its view, this case involves "the routine administrative application of a decades-old standard—originally announced in Montana v. United States, [450 U.S. 544 (1981)]—establishing the circumstances under which a tribe can regulate non-Indians

on fee lands within the boundaries of a reservation." Reply at 17. And though the Tribe argues that Montana does not speak to the *federal government's* authority to condition permits on compliance with tribal laws, Slawson correctly points out that the Tribe would still "need the authority to pass that law in the first instance to trigger such an obligation." Id. at 19.

So a threshold question in this case will be whether the Tribe had the authority to pass its 1000-foot setback law in the first place. Both before this Court and throughout the administrative proceedings, the Tribe has identified two sources of authority for the setback law: its inherent sovereign powers to protect the health and welfare of its members, and its federally-approved 1936 constitution. See Compl. ¶ 71; see also Mot. for TRO, Exhibit 6 (The MHA Nation's Pet. for Stay in Appeal to IBLA), Slawson Exploration Co., Inc. v. U.S. Dep't of Interior, Civ. No. 17-cv-166-DLH-CSM, ECF No. 3-7, at 11–13 (D.N.D. Aug. 12, 2017); MTT, Exhibit F (BLM State Director Decision) at 2–3. The scope of the first asserted source of authority is squarely controlled by Montana. That case presented "the question of the power of [a] Tribe to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the Tribe." Montana, 450 U.S. at 557. The Supreme Court explained the "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Id. at 565. The Court then identified two exceptions to this general rule when "Indian tribes [*do*] retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands": (1) when nonmembers "enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements" and (2) when nonmembers' conduct on fee lands within the reservation "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Id. at 566 (citations

9

omitted). The Tribe contends, as it did in the administrative proceedings, that it had the authority to pass the 1000-foot setback law pursuant to the second Montana exception because that law is intended to protect the health and welfare of its members by protecting the lake from a catastrophic oil spill. Compl. ¶ 71. The Court need not take a position on the merits of the Tribe's argument. It suffices here that the issue involves a straightforward application of Supreme Court precedent to specific facts concerning the health and safety risks of Slawson's drilling operations. That is not a matter of generalized national concern.

The Tribe advances a more colorable argument with respect to its second cited source of authority for the setback law: its federally-approved constitution. The Tribe argues that, separate from its inherent sovereign authority, Article I of its constitution expressly defines the Tribe's civil jurisdiction as extending "to all persons and all lands, *including lands held in fee*, within the exterior boundaries of the Fort Berthold Reservation." Compl. ¶ 15 (emphasis in original). In isolation, this blanket assertion of jurisdiction over fee lands plainly sweeps more broadly than what Montana permits. But the Tribe counters that the Secretary of Interior approved the constitution in 1936 pursuant to an act of Congress—the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*—and, as a result, that approval reflects an express delegation of congressional authority to the Tribe to regulate fee land. By this reasoning, the Tribe says, Montana does not curtail its power to enact the setback law.[1]

---

[1] Slawson has consistently disputed the notion that the Secretary of Interior's approval of the Tribe's 1936 constitution amounted to a delegation of authority to regulate privately-owned fee land. See Reply at 19; MTT Exhibit J (D.N.D. TRO Decision), ECF No. 18-11, at 9 n.5 (explaining that Slawson argued before the District of North Dakota court that the IRA "only authorized the MHA Nation to develop a constitution, and did not specifically approve the constitution at issue").

Again, the Court need not opine on the merits of the Tribe's argument.  Conceptually, the issue could implicate other tribes, although the Tribe cites no case in the almost forty years since Montana pitting its jurisdictional rule against broader assertions of jurisdiction in a federally-approved tribal constitution.  This absence of caselaw might suggest that this case presents less of an issue of general application than the Tribe asserts.  In any event, the Court concludes that potential national implications of this case do not outweigh the significant local interests of North Dakota and its residents, which includes the Tribe.  Moreover, courts in the District of North Dakota are perfectly capable of addressing any broader issues that arise.  "As the D.C. Circuit has articulated, there is no 'blanket rule that national policy cases should be brought [in the District of Columbia].'"  City of W. Palm Beach, 317 F. Supp. 3d at 157 (alterations in original) (quoting Starnes v. McGuire, 512 F.2d 918, 928 (D.C. Cir. 1974)).  Thus, because this case focuses on land in North Dakota and an administrative decision made in North Dakota, and because federal courts in North Dakota are more than capable of handling cases involving national issues, the Court finds that this factor weighs in favor of transfer.

   2. *Familiarity with governing laws*

Although all federal courts are "'presumptively competent to decide' issues of federal law," id. at 156 (citation omitted), courts in this district have considered "the courts' respective knowledge of the parties and facts" as well as any "considerable experience" the transferee court may have in a particular area of the law.  Ysleta del Sur Pueblo v. Nat'l Gaming Comm'n ("Pueblo"), 731 F. Supp. 2d 36, 40–41 (D.D.C. 2010).  Here, the District of North Dakota is already familiar with the parties and the facts in this case and, contrary to the Tribe's assertion, has already considered many of the Tribe's substantive arguments.  Although the District of North Dakota considered an interim administrative stay order rather than the final denial of the

11

Tribe's appeal as here, the court necessarily had to determine whether the Tribe or Slawson was likely to succeed on the merits of the administrative appeal when deciding whether to issue the TRO.  See MTT Exhibit J (D.N.D. TRO Decision), at 8–10.  The District of North Dakota expressly considered whether the MHA Nation had civil jurisdiction over Slawson or the BLM under Montana's second exception, id. at 10, whether the Tribe's constitution authorized it to regulate non-tribal members on fee lands, id. at 10 n.5, and whether the BLM had any "obligation to enforce or recognize tribal law when making federal decisions affecting non-Indian lands," id. at 10.  Those are the very substantive issues the Tribe asserts make this case one of national rather than local importance.

Because the District of North Dakota is familiar with the facts and issues in this case and has already considered the likely merits of some of the Tribe's arguments, the Court concludes that the interest in judicial economy also favors transfer.

### 3. *Relative congestion*

Finally, the third public interest factor weighs slightly against transfer.  Slawson and the federal defendants concede that the District of North Dakota has more pending cases per judgeship than the District of Columbia because of a judicial vacancy.  MTT at 18 n.6; Reply at 11; Fed. Defs.' Reply at 8.  But, as this Court explained in a previous case, "the relative complexity of the two courts' dockets may not be reflected in this purely mathematical statistic" and, in any event, "this one factor, on its own, does not outweigh all of the others."  W. Watersheds Project v. Jewell, 69 F. Supp. 3d 41, 44 (D.D.C. 2014).

### B. Private interest factors

The private interest considerations also weigh in favor of transfer.

*1. Choice of forum and where the claim arose*

Courts ordinarily afford great deference to a plaintiff's choice of forum. <u>Wyandotte Nation v. Salazar</u>, 825 F. Supp. 2d 261, 268 (D.D.C. 2011). A plaintiff's choice of forum is given less deference, however, "'when that choice is not [the] plaintiff's home forum,'" and even less when the chosen forum "has no meaningful ties to the controversy." <u>Id.</u> (first quoting <u>Pueblo</u>, 731 F. Supp. 2d at 42; then quoting <u>Thayer/Patricof Educ. Funding, LLC v. Pryor Res., Inc.</u> 196 F. Supp. 2d 21, 31 (D.D.C. 2002)).

The Court concludes that the Tribe's choice of forum is entitled to less deference here. The Tribe resists this conclusion, arguing that even if the District of Columbia is not its home forum, the Court should afford its choice "substantial deference" because of the unique "government-to-government relationship" between Indian Tribes and the United States. Opp'n at 4–5. But courts in this district have rejected this argument in the past and, as explained above, "have a history of providing less deference to Native American Indian tribes when they have brought suit in this, their non-home forum." <u>Shawnee Tribe</u>, 298 F. Supp. 2d at 25 & 25 n.5.

Moreover, the Court sees few meaningful ties between the District of Columbia and this case. That some of the federal defendants are located in the District of Columbia does not create a substantial factual nexus between the Tribe's complaint and the District. <u>Id.</u> at 25–26 ("[M]ere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C. is not determinative."). Rather, a substantial part of the events giving rise to the Tribe's claims occurred elsewhere: The Tribe's reservation is located in North Dakota; the land in question is located in North Dakota; and it was the BLM's North Dakota Field Office that made the underlying decision to grant Slawson the permits.

The Tribe tries to shift the focus back to the greater Washington region by saying that "[i]t is the OHA Director's decision" to affirm the approval of the petitions "which is on appeal" and that Director is located in nearby Arlington, Virginia. Opp'n at 9. Plaintiff's focus on the OHA Director's involvement is misplaced. Courts in this district generally look to the location of the underlying administrative decision rather than any subsequent appeals when determining where a claim arose. See Intrepid Potash, 669 F. Supp. 2d at 99 (emphasizing that "[w]hile the challenged decision here was made by IBLA in Virginia, the original BLM decision was made in New Mexico"); see also SUWA, 315 F. Supp. 2d at 87 (noting that it was "the BLM Utah state office's" actions that were the "primary issue in this case," not actions taken by the Department or BLM headquarters, because "the actual lease decisions regarding the 21 parcels in dispute were made by officials in BLM's Utah office").

The Tribe further contends that this case is "*not* a run of the mill decision to allow an oil and gas well to be drilled"; it is about "the broader federal decision to no longer require compliance with tribal (or federal) health, welfare, and safety laws." Opp'n at 9. But these arguments simply echo those regarding the national importance of this case and, as explained above, the Court has concluded that any national importance is outweighed by the localized nature of the dispute.

Slawson also argues that the Court should afford some weight to *its* choice of forum. MTT at 13. "A defendant's 'choice of forum must be accorded some weight' if the defendant presents legitimate reasons for preferring to litigate the case in the transferee district. In Administrative Procedure Act ('APA') cases, a defendant's choice of forum deserves 'some weight' where the harm from a federal agency's decision is felt most directly in the transferee district." Gulf Restoration Network v. Jewell, 87 F. Supp. 3d 303, 313 (D.D.C. 2015) (quoting

14

Nat'l Wildlife Fed'n v. Harvey, 437 F. Supp. 2d 42, 48 (D.D.C. 2006)).  As the court acknowledged in Gulf Restoration Network, where the harm is felt most directly overlaps with whether a case presents local issues.  Id.  To the extent there is harm, the economic and environmental impacts of the BLM's approval of the drilling permits will be felt most acutely where Slawson plans to drill.  Accordingly, this factor also weighs slightly in favor of transfer.

      2.  *Other private interest factors*

The remaining private interest factors are relatively inconsequential and do not weigh heavily in either direction.  See Pueblo, 731 F. Supp. 2d at 42 ("[Because] this is an APA case, neither the convenience of the parties and witnesses nor the ease of access to sources of proof weighs heavily in the analysis.").  The Tribe is located solely in North Dakota, making the District of North Dakota more convenient for it; the administrative record appears to have been transferred to the Director in Arlington, Virginia when she took jurisdiction over the Tribe's appeal to the IBLA, see Opp'n at 9, 11; and there are not likely to be any witnesses in this administrative-law case.

### IV. Conclusion

In all, the Court finds that two of the three public interest factors and three of the six private interest factors weigh in favor of transfer; three factors are neutral; and one factor weighs against transfer. Accordingly, it is hereby

**ORDERED** that [18] Intervenor-Defendant Slawson's Motion to Transfer is GRANTED. This action shall be transferred to the United States District Court for the District of North Dakota.

**SO ORDERED.**

                                                                       CHRISTOPHER R. COOPER
                                                                       United States District Judge

Date: <u>February 5, 2019</u>