**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| MANDAN, HIDATSA AND ARIKARA NATION,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; David Bernhardt, in his official capacity as Secretary of the Interior,<br><br>        Defendants,<br><br>        and<br><br>SLAWSON EXPLORATION COMPANY, INC.,<br><br>        Intervenor-Defendant. | Case No. 1:19-cv-00037-DLH-CRH |

**MEMORANDUM IN SUPPORT OF PLAINTIFF MHA NATION'S MOTION
FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND ................................................................................... 1

PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE ........... 2

STANDARD OF REVIEW ................................................................................................... 10

ARGUMENT ........................................................................................................................ 12

    I.    BLM Acted Arbitrarily, Capriciously, and Not in Accordance with the Law in failing to apply, and failing to require Slawson to Comply with the MHA Nation's Setback law for oil and gas development near Lake Sakakawea. .......................................................................... 12

        A.    BLM was required to consider and protect the MHA Nation's jurisdiction and the MHA Nation's legislative determination regarding setbacks. ............................................... 12

        B.    The MHA Nation may regulate the activity of non-Indians on fee land within the reservation when said activity threatens the health and welfare of the MHA Nation. ......... 15

        C.    The BLM failed to consider or apply the MHA Nation's regulatory jurisdiction under the Second *Montana* Exception. .......................................................................................... 20

    II.    BLM Acted Arbitrarily, Capriciously, and Not in Accordance with the Law in BLM incorrectly applying Instruction Memorandum 2009-078. ...................................................... 24

    III.    BLM Acted Arbitrarily, Capriciously, and Not in Accordance with the Law in failing to apply their own and other various federal agencies' setback requirements............................. 29

        A.    BLM was Required to Apply Its North Dakota Resource Management Plan Setback Requirements. ...................................................................................................................... 29

        B.    BLM was Required to apply BIA and FWS Endangered Species Act Lake Setback Requirements. ...................................................................................................................... 31

        C.    BLM was Required to apply the Army Corps of Engineers Setback Requirements.. 32

    V.    The Director abused their discretion by assuming jurisdiction over the appeal before the Board and issuing a decision without analysis of the merits of the appeal............................. 34

CONCLUSION & PRAYER FOR RELIEF.............................................................................. 36

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) ........................................................................... 37

*Assiniboine & Sioux Tribes v. Oil & Gas Conservation,*
  792 F.2d 782 (9th Cir. 1986) ............................................................................... 11

*Attorneys Process and Investigation Services Inc., v. Sac and fox Tribe of Mississippi,*
  609 F.3d 927 (2010) ............................................................................................. 17

*Baltimore Gas & Elc. Co. v. Natural Res. Def Council,*
  462 U.S. 87 (1983) ............................................................................................... 11

*Cherokee Nation v. State of Georgia,*
  30 U.S. 1 (1831) ................................................................................................... 15

*Citizens Against Ruining Our Environment v. Bernhardt,*
  923 F.3d 831 (10th Cir. 2019) ............................................................................. 37

*City of Albuquerque v. Browner,*
  97 F.3d 415 (10th Cir. 1996) ................................................................... 18, 19, 21

*Cobell v. Babbitt,*
  91 F. Supp. 2d 1 (D.D.C. 1999) .......................................................................... 11

*Colville Confederated Tribes v. Walton,*
  647 F.2d 42 (9th Cir. 1981) ........................................................................... 16, 18

*Dickinson v. Zurko,*
  527 U.S. 150 (1999) ............................................................................................. 10

*FCC v. NextWave Personal Communications, Inc.,*
  537 U.S. 293 (2003) ............................................................................................. 37

*Fox v. Clinton,*
  684 F.3d 67 (D.C. Cir. 2012) .............................................................................. 11

*Friends of Boundary Waters Wilderness v. Dombeck,*
  164 F.3d 1115 (8th Cir. 1999) ............................................................................. 27

*High Sierra Hikers Ass'n v. Blackwell,*
  390 F.3d 630 (9th Cir. 2004) ............................................................................... 10

*HRI, Inc. v EPA,*
  198 F.3d 1224 (10th Cir. 2000) ..................................................................... 15, 31

*Iowa League of Cities v. EPA,*
  711 F.3d 844 (8th Cir. 2013) ............................................................................... 37

*Joint Passamaquoddy Tribal Council v. Morton,*
  528 F.2d 370 (1st Cir. 1975) ............................................................................... 14

*Klamath Water Users Protective Ass'n v. Patterson,*
  204 F.3d 1206 (9th Cir. 1999) ............................................................................. 28

*Marsh v. Oregon Natural Res. Council,*
  490 U.S. 360 (1989) ............................................................................................. 11

*Michigan v. Envt'l Protection Agency*,
   135 S.Ct. 2699 (2015) ............................................................................ 24, 26
*Montana v. EPA*,
   137 F.3d 1135 (9th Cir. 1998) ................................................................. 14, 18
*Montana v. United States*,
   450 U.S. 544 (1981) ................................................................................. 15, 16
*Motor Vehicle Mfrs'.Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................... 10, 24
*Nord v. Kelly*,
   520 F.3d 848 (8th Cir. 2008) ........................................................................ 16
*Northern Arapahoe Tribe v. Hodel*,
   808 F.2d 741 (10th Cir. 1987) ...................................................................... 14
*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2004) ........................................................................ 11
*Plains Commerce Bank v. Long Family Land & Cattle Co.*,
   128 S Ct. 2709 (2008) ...................................................................... 15, 16, 17
*Pyramid Lake Paiute Tribe v. Morton*,
   354 F. Supp. 252 (D.D.C. 1972) ............................................................... 28, 30
*Seminole Nation v. United States*,
   316 U.S. 286 (1942) ................................................................................. 11, 15
*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   2017 WL 2573994 (D.D.C. June 14, 2017) .................................................. 27
*Strate* v. *A-1 Contractors*,
   520 U.S. 438 (1997) ................................................................................. 15, 16
*United Keetoowah Band of Cherokee Indians*,
   933 F.3d 728 (D.C. Cir. 2019) ...................................................................... 24
*United States v. Bean*,
   537 U.S. 71 (2002) ........................................................................................ 10
*United States v. Creek Nation*,
   295 U.S. 103 (1935) ...................................................................................... 14
*United States v. Gila River Valley Irrigation Dist.*,
   920 F. Supp. 1444 (D. Ariz. 1996) ............................................................... 17
*United States v. Mitchell*,
   463 U.S. 206 (1983) ...................................................................................... 14
*Wellford v. Ruckelshaus*,
   439 F.2d 598 (D.C. Cir. 1971) ........................................................... 11, 12, 13
*Winters v. United States*,
   207 U.S. 564 (1908) ...................................................................................... 16

**Statutes**

5 U.S.C. § 706 ................................................................................................ 8, 37
5 U.S.C. § 706(2)(A) ......................................................................................... 10
16 U.S.C. § 1531 ............................................................................................ 5, 31
25 U.S.C. § 461 .................................................................................................. 2
25 U.S.C. § 5123 .............................................................................................. 12

Flood Control Act of 1944, 56 Stat. 887 ...................................................................... 3

Rules

Federal Rule of Civil Procedure 41(a)(1)(A)(i) ........................................................ 9
D.N.D.Civ.L.R. 7 ....................................................................................................... 2


Regulations

43 C.F.R. Part 4 ......................................................................................................... 7
43 C.F.R. § 4.28 ................................................................................................... 10, 35
43 C.F.R. §§ 3165.4(a) and (c) ................................................................................. 7
45 C.F.R. § 4.5(b) ...................................................................................................... 9

**INTRODUCTION AND BACKGROUND**

This case challenges actions by the Bureau of Land Management ("BLM") and the Director of the Department of Interior's Office of Hearing and Appeals (Director), that authorized the Torpedo Project ("Project"), a commercial oil and gas well on fee lands within the exterior boundaries of the Mandan Hidatsa Arikara Nation's ("MHA Nation") Fort Berthold Indian Reservation and within 1,000 feet of Lake Sakakawea.  The MHA Nation brought this case due to the BLM and Director's blatant disregard for the MHA Nation's inherent sovereign right to regulate activities within its reservation that threaten the health and welfare of its tribal members. Because of its regulatory authority, and independently because of the United States government-to-government relationship with the Tribe, BLM erred when it did not require a tribal variance of the setback requirement and when it did not even require compliance with federal policies and guidance for commercial oil and gas projects located near Lake Sakakawea, the MHA Nation's primary water source and heart its's religious and cultural identity.

Recognizing the potential catastrophic consequences to tribal water rights and the traditional lifeways of the MHA Nation resulting from oil and gas operations near Lake Sakakawea, the MHA Nation took action to protect its lands, natural and cultural resources, and health and welfare of its membership by enacting a tribal law requiring well sites to be setback at least 1,000 feet from the Lake.  Throughout the BLM's consideration of the Project, the MHA Nation repeatedly asserted its jurisdiction over the project and maintained the position that the Project must obtain a variance to setback requirement established in tribal law.

Ignoring the MHA Nation's jurisdiction, ignoring that the tribal setback requirement is redundant to applicable federal setback requirements, and based upon application of the wrong standards from its own regulatory scheme, BLM approved eight of the Project's Applications for

Permit to Drill (APDs) a mere 600 feet from Lake Sakakawea, in violation of tribal law and federal policy, while at the same time failing to analyze the potential environmental effects of said violations. As such, BLM's approval and the Director's upholding of the approval represent a flagrant eschewal of Agency's responsibility in permitting the Project, including BLM's federal trust responsibility, and are thus arbitrary, capricious, and contrary with the law.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Plaintiff provides the following statement of material facts not in genuine dispute. D.N.D. Civ. L.R. 7.1(A)(2).

The MHA Nation resides on the Fort Berthold Indian Reservation in west central North Dakota.  Compl. ¶ 11; Slawson Answer ¶ 11.  The Fort Berthold Indian Reservation includes an area of about 1,530 square miles or 980,000 acres.  The United States holds title to approximately 455,000 acres of land within the exterior boundaries of the Fort Berthold Indian Reservation in trust for the MHA Nation and its members.  Compl. ¶ 12; DOI Answer ¶ 12.  The Fort Berthold Indian Reservation is located in the heart of the Williston Basin, which contains the oil-rich Bakken and Three Forks formations.  Oil and gas wells on the Reservation account for roughly twenty percent (20%) of North Dakota's daily oil production.  Compl. ¶ 13; Slawson Answer ¶ 13.

The MHA Nation is organized under the Indian Reorganization Act of 1934, 25 U.S.C. § 461, *et seq.* ("IRA").  The United States Secretary of the Interior approved the MHA Nation's Constitution and Bylaws on June 29, 1936, under Section 16 of the IRA.  Compl. ¶ 14; Slawson Answer ¶ 14; DOI Answer ¶ 14.

Under Article I of its federally approved IRA Constitution, the MHA Nation exercises jurisdiction over "all persons and all lands, including lands held in fee, within the exterior

boundaries of the Fort Berthold Reservation." The MHA Nation also exercises powers of self-governance within those lands. Compl. ¶ 15; Slawson Answer ¶ 15.

Article VI § 3 grants the MHA Nation's governing body, the Tribal Business Council, with "all necessary sovereign authority – legislative and judicial – for the purpose of exercising the jurisdiction granted . . . in Article I of this Constitution." Compl. ¶ 16; Slawson Answer ¶ 16.

Article VI § 5(j) provides the MHA Nation's governing body with authority over "natural resources" which includes water resources. Compl. ¶ 17; Slawson Answer ¶ 17.

In 1947, the Army Corps of Engineers ("Army Corps") began construction on the Garrison Dam on the Fort Berthold Indian Reservation under the authority of the Flood Control Act of 1944, P.L. 78-534, 56 Stat. 887. The Garrison Dam is one of six dams built and operated by the Army Corps on the Missouri River's Main Stem under the Pick Sloan Program. Compl. ¶ 18; Slawson Answer ¶ 18. Completed in 1953, the water impounded by the Garrison Dam created a large reservoir called Lake Sakakawea, which runs through the heart of the Fort Berthold Indian Reservation. Compl. ¶ 19; Slawson Answer ¶ 19; DOI Answer ¶ 19.

Lake Sakakawea provides a critical source of tribal and public waters, as well as natural, cultural, and recreational resources. The Lake is the primary source of the MHA Nation's drinking water, and is also part of the Missouri River, which provides drinking water to millions of individuals downstream from the MHA Nation's Reservation. Compl. ¶ 20; Slawson Answer ¶ 20; DOI Answer ¶ 20. The waters of Lake Sakakawea and the Missouri River are at the heart of the MHA Nation's religious and cultural identity and are relied on for the MHA Nation's sustenance and economic livelihood. Compl. ¶ 21; Slawson Answer ¶ 21; DOI Answer ¶ 21.

**Tribal and Federal Setbacks for Oil and Gas Development Near Lake Sakakawea**

In August 2012, the MHA Nation enacted *The Missouri River, Badlands and Sacred Sites Protection Act*, Resolution No. 12-087-VJB, which required well sites for oil and gas operations to be setback at least one half-mile from the Missouri and Little Missouri River.  Compl. ¶ 22; Slawson Answer ¶ 22.   In December 2012, the MHA Nation amended its setback law, via Resolution No. 12-139-VJB, to provide a process for obtaining a tribal variance from the one half-mile setback requirements.  Resolution No. 12-139-VJB also clarified that the Missouri and Little Missouri River includes Lake Sakakawea.  Compl. ¶ 23; Slawson Answer ¶ 23.  In February 2017, the MHA Nation enacted Resolution No. 17-038-FWF, which provided that, similar to federal setback requirements, variances were not permitted where a project was less than 1,000 feet from the waters of the Missouri and Little Missouri.  Compl. ¶ 24; Slawson Answer ¶ 24.

In 1988, the Bureau of Land Management ("BLM") implemented its North Dakota Resource Management Plan ("RMP") to "establish[ ] management strategies for federal minerals located under BLM-administered surface and under private lands not situated within the administrative boundaries of other federal land management agencies . . ."  AR-006556; AR-00743. BLM's RMP identifies "special areas," including areas "1,000 feet . . . from larger perennial streams, rivers, and domestic water supplies" for which "use or occupancy within such special areas will be strictly controlled, or if absolutely necessary, excluded."  AR-007479.

In December 2013, the Army Corps issued its *Garrison Project-Lake Sakakawea Oil and Gas Management Plan* ("Army Corps Plan") to address the impacts oil and gas exploration, development, and production projects have on the surface and subsurface estates of the Garrison Project.  Compl. ¶ 33; Slawson Answer ¶ 33; *see also* AR-007541-7547.

4

The Army Corps Plan applies to federal, state, and private minerals located within the Garrison Project.  Compl. ¶ 34; Slawson Answer ¶ 34; *see also* AR-007542-7545. The Army Corps Plan identifies special areas where surface use or occupancy is strictly controlled or prohibited. One of the special areas identified in the Army Corps Plan is areas within .25 miles (1,320 feet) of surface water or riparian areas.  In these areas, the Army Corps Plan allows for a waiver or modification of this limitation.  Compl. ¶ 35; Slawson Answer ¶ 35; *see also* AR-007546-7547.

In May 2014, the Bureau of Indian Affairs ("BIA") prepared a Programmatic Biological Assessment and Biological Evaluation for Fort Berthold Indian Reservation Oil and Gas Development ("Programmatic BA/BE") in concurrence with the U.S. Fish and Wildlife Service ("FWS") to comply with the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, for oil and gas development on the Fort Berthold Indian Reservation.  Compl. ¶ 37; Slawson Answer ¶ 37; *see also* AR-007445-7447. The Programmatic BA/BE establishes a minimum 1,000-foot setback as both a general and specific requirement for oil and gas development around Lake Sakakawea. The Programmatic BA/BE and its 1,000-foot setback covers oil and gas development for the five year period from 2014 to 2019.  Compl. ¶ 38; Slawson Answer ¶ 38; *see also* AR-007451.  On June 4, 2014, FWS concurred with BIA's findings and conditions in the Programmatic BA/BE, including a conclusion that the 1,000-foot setback from Lake Sakakawea was necessary to protect listed species and designated critical habitat.  Compl. ¶ 39; Slawson Answer ¶ 39; *see also* AR-007456.

**Slawson Exploration Company's Torpedo Project**

On May 31, 2011 and August 2, 2011, Slawson submitted APDs for six wells to BLM's North Dakota Field Office.  On June 2, 2015, Slawson submitted APDs for an additional two wells to the North Dakota Field Office.  Collectively, these eight wells comprise what is referred to as the Torpedo Project ("Project").  Compl. ¶ 41; Slawson Answer ¶ 41; DOI Answer ¶ 41. The

Project is on fee lands within the exterior boundaries of the MHA Nation's Fort Berthold Indian Reservation within the State of North Dakota. The Project is located on the southern end of a peninsula that extends into the Van Hook Arm of Lake Sakakawea. Compl. ¶ 42; Slawson Answer ¶ 42; DOI Answer ¶ 42; AR-2239, 6356 (close-up and overview maps of Project location).

The Project was sited and constructed within 1,000 feet of Lake Sakakawea. Compl. ¶ 43; Slawson Answer ¶ 43; DOI Answer ¶ 43; AR-006403 (indicating in BLM's EA that at its nearest point, the Project is 600 feet from Lake Sakakawea). Slawson intentionally selected the location near the shoreline. The minerals leased by Slawson are approximately two to three miles from its shoreline well pad. Compl. ¶ 45; Slawson Answer ¶ 45; DOI Answer ¶ 45. Slawson chose this location based upon the location of the federal minerals. AR-002513, 6402; Slawson Answer ¶45, DOI Answer ¶45.

The Project is an industrial site that includes a well pad and access road for the drilling of eight oil and gas wells underneath Lake Sakakawea. The site also includes oil drilling, pumping, supporting infrastructure and facilities, truck traffic and the construction of flowlines consisting of several steel pipelines that will transport produced oil and water from the well pad to an existing five-acre facilities pad hosting tank batteries located approximately .9 miles northeast of the well pad. The Project will disturb approximately 24.47 acres prior to reclamation and 5.56 acres within a 14.56 acre fenced area following reclamation. Compl. ¶ 46; Slawson Answer ¶ 46; DOI Answer ¶ 46. If the proposed oil and gas wells are economically feasible for commercial production, the leases permit Slawson to conduct further exploration of the surrounding areas and to drill additional wells. Compl. ¶ 47; Slawson Answer ¶ 47; DOI Answer ¶ 47.

After Slawson submitted its APDs for the Project, the BLM held a thirty-day public scoping period from November 9 to December 9 2015. BLM then prepared a Draft Environmental

Assessment ("EA"), solicited public comment, and issued its final EA in March 2017.  Compl. ¶ 48; Slawson Answer ¶ 48; DOI Answer ¶ 48. On March 10, 2017, BLM's North Dakota Field Office issued its Decision Record and Finding of No Significant Impact ("DR/FONSI") approving Slawson's eight associated APDs.  BLM did not apply the MHA Nation's 1,000-foot setback in its DR/FONSI.  Compl. ¶ 49; Slawson Answer ¶ 49; *see also* AR-007431, 007442-7443.

**Administrative Appeals**

The MHA Nation sought administrative review of the North Dakota Field Office's decision by filing a request for BLM State Director Review in April 2017.  The MHA Nation asserted that Field Office's decision was contrary to federal law and policy, because, inter alia it BLM had the obligation to require the setback (or a variance therefrom) provided for in the Tribe's law, and because the Field Office's decision conflicted with the BLM's RMP and the setback requirements of the BIA, FWS, and the Army Corps.  Compl. ¶ 50; Slawson Answer ¶ 50; *see also* AR-007395-7403. The Acting State Director of the BLM Montana State Office denied the MHA Nation's request for stay and affirmed the Field Office's DR/FONSI authorizing the Project on April 24, 2017.  Its decision was not based upon the full administrative record.  The State Director's decision was based on a finding that BLM was not bound by any of the four distinct 1,000-foot setback rules, regulations, or guidelines related to oil and gas activity near Lake Sakakawea.  Compl. ¶ 51; Slawson Answer ¶ 51; *see also* AR-007567, 007568-7580.

On May 24, 2017, the MHA Nation timely filed an appeal and petition for stay of the Acting State Director's decision with the Interior Board of Land Appeals ("Board") pursuant to 43 C.F.R. §§ 3165.4(a) and (c) and 43 C.F.R. Part 4.  Slawson subsequently intervened in the appeal and filed a brief responding to the MHA Nation's request.  Briefing on the MHA Nation's petition for stay was completed on June 5, 2017.  Compl. ¶ 52; Slawson Answer ¶ 52; DOI Answer ¶ 52.

On August 9, 2017, the Board issued an order staying the State Director's decision and its approval of the BLM Field Office's DR/FONSI until the appeal proceedings before the Board were completed.  The Board granted the MHA Nation's petition based on a determination that the MHA Nation's appeal raised multiple legal issues of first impression that could only be properly addressed after a thorough review of applicable law and precedent.  Compl. ¶ 53; Slawson Answer ¶ 53; *see also* AR-008339-8348.

**U.S. District Court for the District of North Dakota Proceedings**

On August 11, 2017, following the Board's entry of the stay and while briefing of the matter before the Board was ongoing, Slawson filed a complaint in the United States District Court for the District of North Dakota requesting declaratory and injunctive relief from the Board's stay order under the APA, 5 U.S.C. § 706.  Compl. ¶ 54; Slawson Answer ¶ 54; *see also* AR-008034. The next day, Slawson filed a motion for a temporary restraining order ("TRO") and preliminary injunction with this Court seeking to enjoin enforcement of the Board's temporary stay order. Slawson's motion claimed its ongoing oil and gas activities at the Project were harmed by the Board's stay even though Slawson had been provided full notice of the stay, participated in briefing on the stay and was advised by the Board on July 21, 2017 that the MHA Nation's request for stay was still pending.  Compl. ¶ 55; Slawson Answer ¶ 55; *see also* AR-008915-8918.

This Court granted the TRO against the Board's stay order on August 15, 2017, allowing Slawson to resume drilling within 1,000 feet of Lake Sakakawea.  The TRO was issued *ex parte* without briefing or hearing from any other party in this case.  This Court, in its order, set a hearing for a preliminary injunction on August 29, 2017.  Compl. ¶ 56; Slawson Answer ¶ 56. Slawson did not name the MHA Nation as a party to that suit, and this Court did not require notice to the

MHA Nation prior to consideration and issuance of the TRO.  Compl. ¶ 57; Slawson Answer ¶ 57; DOI Answer ¶ 57.

While this Court's decision was strictly temporary, on August 21, 2017, federal defendants sought a more than two-month extension of the TRO until October 31, 2017.  Federal defendants, including the Department of the Interior, also requested that the court stay the proceedings before them until further order by the court.  This Court granted the federal defendants' motion the next day.  Compl. ¶ 58; Slawson Answer ¶ 58; *see also* AR-008958-8961.

On September 25, 2017, the MHA Nation filed a motion to intervene in the district court action, which was granted on October 11, 2017.  Compl. ¶ 59; Slawson Answer ¶ 59; DOI Answer ¶ 59. On October 12, 2017, the MHA Nation filed a motion to dismiss Slawson's complaint and dissolve the TRO based on lack of final agency action and Slawson's failure to exhaust the available administrative remedies.  On November 27, 2017, the court issued an order denying the MHA Nation's motion to dismiss and granting Slawson's request for preliminary injunction. Compl. ¶ 60; Slawson Answer ¶ 60; DOI Answer ¶ 60. Slawson subsequently filed a notice of voluntary dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) and the case was consequently dismissed.  Compl. ¶ 61; Slawson Answer ¶ 61; DOI Answer ¶ 61.

**OHA Director Review**

On October 2, 2017, BLM filed a Petition for Director's Review in the ongoing administrative proceeding before the Board, requesting the Director of the United States Department of Interior Office of Hearing and Appeals ("OHA") review and invalidate the Board's stay order, take jurisdiction over the administrative appeal, and render a final decision on the matter.  On October 10, 2017, Slawson also filed its own request for OHA Director Review under 45 C.F.R. § 4.5(b), which requested the Director assume jurisdiction over the entire appeal and

issue a decision on the appeal.  Compl. ¶ 62; Slawson Answer ¶ 62; *see also* AR-009353-9380, 007667-7680.  The Director granted the BLM's Petition and Slawson's request, assumed jurisdiction of the case, and directed parties to submit a proposed briefing schedule.  Compl. ¶ 63; Slawson Answer ¶ 63; *see also* AR-009052-9054. On October 17, 2017, the MHA Nation requested reconsideration of the Director's assumption of jurisdiction on this case based on its inability to respond to BLM and Slawson's initial petitions for Director review and Department regulations at 43 C.F.R. § 4.28.  Compl. ¶ 64; Slawson Answer ¶ 64; *see also* AR-009000-9020.

On March 22, 2018, the Director issued a Decision in the appeal which found the Board's stay order was in error, affirmed BLM's DR/FONSI approving the APDs, and denied the MHA Nation's request for reconsideration.  Compl. ¶ 65; Slawson Answer ¶ 65; *see also* AR-008326-8335. The Director's Decision found the Board's stay order invalid while also acknowledging that the stay-related filings involved legal issues the Board does not regularly confront and a project with technical complexity.  Compl. ¶ 66; Slawson Answer ¶ 66; *see also* AR-008326-8335.

### STANDARD OF REVIEW

The APA sets forth standards governing judicial review of decisions made by federal administrative agencies.  *Dickinson v. Zurko*, 527 U.S. 150, 152 (1999); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004).  Under the APA, courts will set aside agency actions they determine were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *United States v. Bean*, 537 U.S. 71, 77 (2002); *High Sierra Hikers Ass'n*, 390 F.3d at 638.  Agency action is arbitrary and capricious where an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs'.Ass'n*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). A decision can be upheld only where the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Baltimore Gas & Elc. Co. v. Natural Res. Def Council*, 462 U.S. 87, 105 (1983); *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376 (1989).

In considering whether to set aside an agency action, courts will evaluate whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004); *see also Marsh*, 490 U.S. at 378. Courts will not "rubber stamp" administrative decisions inconsistent with a statutory mandate or "that frustrate the congressional policy underlying a statute." *Id.* "No deference is owed to an agency action that is based on an agency's purported expertise where the agency's explanation for its action lacks any coherence." *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012).

Furthermore, violations of an agency's duties to protect a MHA Nation's trust resources are subject to "the most exacting fiduciary standards." *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 46 (D.D.C. 1999) (citing *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942)); *Assiniboine & Sioux Tribes v. Oil & Gas Conservation*, 792 F.2d 782, 794 (9th Cir. 1986). "Close scrutiny of administrative action is particularly appropriate when the interests at stake are not merely economic interests…but personal interests of life and health." *Id.* (citing *Wellford v. Ruckelshaus*, 439 F.2d 598, 601 (D.C. Cir. 1971)).

## ARGUMENT

I.   **BLM Acted Arbitrarily, Capriciously, and Not in Accordance with the Law in failing to apply, and failing to require Slawson to Comply with the MHA Nation's Setback law for oil and gas development near Lake Sakakawea.**

### A.   BLM was required to consider and protect the MHA Nation's jurisdiction and the MHA Nation's legislative determination regarding setbacks.

The first issue in this case is whether the BLM, as a condition of permitting, should have required Slawson to comply with the MHA Nation's setback laws.  BLM and the Director made multiple errors in their decisions on that issue.  First, they did not decide the issue that they needed to decide.  Instead they erroneously reduce the issue down to whether the Tribe would have adjudicatory authority over Slawson, instead of reviewing whether BLM (which had unquestioned regulatory authority to regulate) should require Slawson to comply with the MHA Nation's setback laws.  Next, they erroneously decided that the Tribe would not have adjudicatory authority.  Each of these errors, independently, requires reversal and remand to the Agency.

The MHA Nation has the authority to adopt regulations to protect the waters of the Missouri River.  The Nation's regulatory authority over the lands and activities on its Reservation stems from its federally approved Constitution and Bylaws.  AR-007417-7428.  The MHA Nation is organized under Section 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 5123. ("IRA").  The MHA Nation chose to accept organization under the IRA and the Secretary approved the MHA Nation Constitution in 1936.  AR-007428.  The Secretary's approval of the MHA Nation Constitution stated that "[a]ll officers and employees of the Interior Department are ordered to abide by the provisions of said Constitution and Bylaws."  *Id.*  Thus, as "officers and employees" of Interior, BLM is required to comply with the MHA Nation Constitution.

On June 18, 1985, and pursuant to the authority delegated to the office by the Secretary, the Deputy Assistant of Indian Affairs signed and approved the MHA Nation's amended

Constitution, which clarified the MHA Nation's jurisdiction over the Reservation and all persons engaging in economic activity therein.  Article I was amended to read:

> The jurisdiction of the Three Affiliated Tribes of the Fort Berthold Reservation *shall extend to all persons and lands, including lands held in fee, within the exterior boundaries of the Fort Berthold Reservation*

(emphasis added). AR-007758.  Thus, as approved by the Department of Interior, the MHA Nation's Constitution provides for the broad jurisdiction over all persons and lands, including lands held in fee, and the waters of the major river flowing across those lands, within the exterior boundaries of the Fort Berthold Reservation. *Id.* As discussed by the Associate Solicitor at the time of the amendment's passing, "The [T]ribe would have to enact ordinances…regulating a particular activity, in order to effectuate the assertion of authority contained in the constitution. AR-0077510.

That is exactly what the MHA Nation did through the *The Missouri River, Badlands and Sacred Sites Protection Act*, ("Act" or "setback law").  Under the authorities of Article I and Article VI of its Constitution, in 2012 the MHA Nation enacted its first law including setback requirements to protect its drinking waters and natural and cultural resources.  AR-007406-7408.  The Resolution also designated sacred sites that are to be protected from excessive development.  *Id.* The Resolution states that the MHA Nation enacted these restrictions "to protect the rustic Badlands and the Grandfather Missouri River and Little Missouri River from environmental degradation due to oil and gas development" and called on "all Federal Agencies" to assist in carrying out and complying with the mandates of the resolution.  *Id.* As amended, by Resolution No. 12-139-VJB and Resolution No. 17-038-FWF, the Act now clarifies that "the Missouri River and Little Missouri River" includes "Lake Sakakawea" while imposing a half-mile setback with the ability for a proponent to obtain a variances so long as it contains at least a 1,000-foot setback from Lake Sakakawea. AR-007410-007412; 007414-7415.

13

The record in this matter discusses that the River has religious, cultural, and historic interests in the River, but the Court need not even consider those interests because the River is the Tribe's drinking water.  The Tribe has an obvious interest in protection of the River.

Courts have routinely upheld tribal regulation of non-Indian activities when aimed at protecting their water resources.  For example, in *Montana v. EPA*, 137 F.3d 1135, 1141 (9th Cir. 1998), the Court upheld EPA's approval of tribal regulation of reservation water resources pursuant to the Clean Water Act even when that regulation affects non-Indians on fee land.  The Court's affirmation of tribal authority was based in part on EPA's "generalized finding that due to the mobile nature of pollutants in surface water it would in practice be very difficult to separate the effects of water quality impairment on non-Indian fee land from impairment on the tribal portions of the reservation…." *Id.*

The BLM has a trust responsibility to recognize and enforce the MHA Nation's laws, particularly when those laws are aimed at protecting trust resources. The federal government's trust responsibility is established by the provisions in treaties, statutes, and agreements, and is "reinforced by the undisputed existence of a general trust relationship between the United States and Indian people." *United States v. Mitchell*, 463 U.S. 206, 226 (1983). It is based on the federal government's duty to protect tribal survival by protecting tribal lands, resources, and the native way of life, as well as shielding Indian lands from environmental threats. *E.g.*, *United States v. Creek Nation*, 295 U.S. 103 (1935); *Northern Arapahoe Tribe v. Hodel*, 808 F.2d 741, 750 (10th Cir. 1987) (finding trust responsibility to protect tribe's wildlife resources); *Joint Passamaquoddy Tribal Council v. Morton*, 528 F.2d 370, 379 (1st Cir. 1975) (noting the federal government's fiduciary duty to protect tribal lands is "beyond question").

Under that trust duty, the United States is required to protect Indian tribes' rights, resources, and interests as a guardian would protect those of his or her ward. *Cherokee Nation v. State of Georgia*, 30 U.S. 1, 2 (1831). In discharging this responsibility, federal agencies must observe "obligations of the highest responsibility and trust" and "the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942).  In light of the preservation goals of the trust responsibility, the "federal government bears a special trust obligation to protect the interests of Indian tribes, including *protecting tribal property and jurisdiction*."  *HRI, Inc. v EPA*, 198 F.3d 1224, 1245 (10th Cir. 2000) (emphasis added).

Applied to the facts here, the BLM's trust obligation mandated it protect the MHA Nation's jurisdiction authority and the MHA Nation's determination of how to protect the River, by applying the Act as enacted under the Nation's IRA Constitution.

### B. The MHA Nation may regulate the activity of non-Indians on fee land within the reservation when said activity threatens the health and welfare of the MHA Nation.

The U.S. Supreme Court has recognized and upheld that Indian tribes have the inherent authority to regulate the activities of non-Indians on fee lands within reservations. *Montana v. United States,* 450 U.S. 544 (1981).  In *Montana,* the Supreme Court discussed two independent grounds for tribal civil regulatory jurisdiction over non-members, the second of which being the "inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566.

The Supreme Court has since extrapolated on the second *Montana* exception in *Strate* and *Plains Commerce*.  *Strate* v. *A-1 Contractors*, 520 U.S. 438 (1997); *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S Ct. 2709, 2726 (2008). In *Strate*, the Court considered

whether the exceptions extended tribal jurisdiction to claims against non-members arising out of an accident on a state highway within a reservation. In finding the second *Montana* exception did not provide jurisdiction, the Court recognized that while reckless driving in the reservation "undoubtedly" threatened the safety of tribal members, it was not "necessary to protect tribal self-government or to control internal relations." *Strate,* 520 U.S. at 457, 59 (citing *Montana*, 450 U.S., at 564). *See also Plains Commerce*, 128 S Ct. at 2726 (second Montana exception did not provide for tribal court jurisdiction over sale of former Indian-owned fee land).

Unlike *Strate*, the MHA Nation is not asserting adjudicatory jurisdiction over an ordinary tort claim, but instead regulatory authority regarding proximity of well cites to in the heart of its reservation to its primary water source and center of its cultural identity. Moreover, the permitting of the Project is not analogous to a careless driver on a public highway as it does not simply threaten the health and welfare "of a few individual members." *Nord v. Kelly*, 520 F.3d 848, 856-57 (8th Cir. 2008). Instead, the conduct in this case threatens both the physical and spiritual health and welfare of not only the entire MHA Nation membership, but future generations.

The ability of a MHA Nation to regulate its water and the MHA Nation's federally reserved water, is vital to tribal self-governance and sovereignty. In fact, reserved water rights are so paramount to the survival of an Indian tribe that the Supreme Court found them implicitly reserved at the creation of a tribe's reservation, because without the reserved rights, "civilized communities could not be established thereon." *Winters v. United States*, 207 U.S. 564, 576 (1908); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 52 (9th Cir. 1981) ("Regulation of water on a reservation is critical to the lifestyle of its residents and the development of its resources…Its regulation is an important sovereign power."). This *Winters* right is a property right to a sufficient quantity and quality of water to meet these beneficial purposes for which its Reservation was

16

established. *E.g.*, *United States v. Gila River Valley Irrigation Dist.*, 920 F. Supp. 1444, 1448 (D. Ariz. 1996), aff'd 117 F.3d 425 (9th Cir. 1997). Simply put, the conduct of users of a small stretch of highway has no potential to imperil the subsistence of a tribe in any way approaching the threat inherent in the impairment of a tribe's principal water source and spiritual core.

The facts here are similarly inapposite of the sale of land and resulting discrimination claim at issue in in *Plains Commerce*. There, Court found persuasive the fact that tribal regulation effectively "operate[d] as a restraint on alienation" against the land at issue which been owned by a non-Indian for at least 50 years, "during which time…tribal self-government ha[d] proceeded without interruption." *Id*. at 2721. In this case, the MHA Nation's setback law cannot reasonably be argued to implicate the alienation of the fee land the Project is located on or prohibit the development of the Project. Instead, it simply establishes reasonable siting restrictions on where an inherently dangerous activities can take place within its reservation. This regulation of the *uses* of fee land was explicitly endorsed by the Court:

> As our cases bear out, the tribe may quite legitimately seek to protect its members from noxious uses that threaten tribal welfare or security, or from nonmember conduct on the land that does the same. But the key point is that any threat to the tribe's sovereign interests flows from changed uses or nonmember activities, rather than from the mere fact of resale.

*Id*. at 2724. Under this case law, the MHA Nation has the authority to require that well pads not be located on the banks of the Missouri River in the heart of its Reservation.

This is particularly true under the Eighth Circuit's instruction that in determining the relevant facts in applying the second *Montana* exception they are to take a "functional view" which rests on "the circumstances of [the] case." *Attorneys Process and Investigation Services Inc., v. Sac and fox Tribe of Mississippi*, 609 F.3d 927, 938 (2010) (internal quotations omitted). On one side is the MHA Nation, whose sole interest in asserting its setback law is to facilitate responsible

oil and gas development within its reservation while protecting its water resources and right, the most vital resource to the MHA Nation's physical, spiritual, and economic wellbeing. On the other side are BLM and Slawson's interest in commercially developing minerals located in the heart of the MHA Nation's reservation and underneath its water source and cultural identity.  Simply put, if the facts of this case do not represent conduct that has "some direct effect on the political integrity, economic security, or the health or welfare of the MHA Nation" then the second *Montana* exception as dictated by the Supreme Court will have been effectively interpreted out of existence.

The siting of an oil and gas development near a tribe's water supply is exactly the kind of non-Indian activity that implicates a tribe's sovereign interests, and which provides the Tribe with authority to adopt a setback law from the River.  Federal circuits have routinely upheld tribal regulatory authority to protect water resources

It is well understood that water systems are unitary resources, where the actions of one user has an immediate and direct effect on other users.  In *Montana v. EPA*, the court upheld EPA's approval of tribal regulation of reservation water resources pursuant to the Clean Water Act even when that regulatory authority impacted non-Indians. 137 F.3d at 1141. The Ninth Circuit's affirmation of tribal regulatory authority was based in part on EPA's finding that "due to the mobile nature of pollutants in surface water it would in practice be very difficult to separate the effects of water quality impairment on non-Indian fee land from impairment on tribal portions of the reservation . . ."  *Id.*  (quoting *Colville*, 647 F.2d at 52.)  The Tenth Circuit has also affirmed tribal regulatory jurisdiction to protect water resources.  In *City of Albuquerque v. Browner*, 97 F.3d 415 (10th Cir. 1996), the court rejected contentions that the tribe could not enact regulations that imposed higher water quality standards affecting non-Indians.  In doing so, the court held that the

18

authority to enact regulations protecting water quality were "in accord with powers inherent in Indian tribal sovereignty." *Id*. at 423.

Analogously, as the undisputed facts discussed above show that the MHA Nation enacted its setback law to protect its water supply from the mobile pollutants inherent in all oil and gas development.  It was understood by all the parties throughout the BLM's review of this project that the purpose of the setback to protect the MHA Nation's water quality and cultural and natural resources.  AR-002551; 010970; 010977-80.

The MHA Nation took action to protect its water resources for good reason.  Oil and gas drilling is an inherently dangerous activity that includes numerous spills of hazardous fluids.  In the last 12 months, oil and gas companies reported 384 oil spills in North Dakota, including 76 that were not contained within the oil and gas production facility.  https://deq.nd.gov/WQ/ 4_Spill_Investigations/Reports.aspx.  This was not an unusual year.  From June 2017 to June 2018, for example, the North Dakota Department of Environmental Quality reported 1,059 spills in North Dakota.  https://deq.nd.gov/FOIA/Spills/defaultOGarc.aspx/.  All of these spills threatened the "health and welfare" of the surrounding communities.  If any of these spills had gotten into the water system they would have imperiled the affected community.

The inherent and unpredictable risk associated with oil and gas development is further supported by a review of Slawson's poor spill record, with which the MHA Nation was intimately familiar when it adopted its setback law. As discussed above, the MHA Nation originally developed its setback law in response to a major blowout at a well owned by Slawson and located on the Van Hook Arm which, resulted in the release of 800 barrels of oil and 400 barrels of brine, with the discharges spraying 50 feet into the air 1,000 feet from the well. AR-002530; 006501. Exhibit 2.  More recently, on Friday, June 14, 2019, Slawson notified the North Dakota Oil and

Gas Division of a fire at the Van Hook 1-9 saltwater disposal facility, located near to where the Torpedo Project was permitted. Exhibit 3.  Slawson reported 867 barrels of oil and 2,603 barrels of brine was released at the location.  The record also contains details of sixteen reported spills from Slawson owned projects in the BML's Automated Fluid Minerals Support System.  AR-005225, and approximately twenty-eight separate "Incidents of Noncompliance" since 2014, with sixteen occurring in that year alone.  AR-005224; 005231.

Against this backdrop, the MHA Nation passed a setback law, which implemented a common sense and narrowly tailored safeguard to protect Lake Sakakawea from potential spills by requiring enough setback from the lake to provide emergency response time in case a spill is not contained within the oil and gas facility.  This is the same conclusion reached by every other federal agency that regulates oil and gas development around Lake Sakakawea, all of which require a 1,000-foot setback.  The benefits of a setback were also acknowledged by both BLM and Slawson as a way to reduce the likelihood of a spill or blowout reaching Lake Sakakawea's waters in their review of the Project.  AR-002498 ("If an aerial release occurs and the prevailing winds are N/NW the greater distance…helps to alleviate some of the risk.  Also, should a non-aerial release occur the greater distance would allow for more response time to the incident."); AR-005838 (The threat of oil reaching Lake Sakakawea "may be possible, depending on the distance from the lake and the magnitude of the accompanying precipitation event.").

### C. The BLM failed to consider or apply the MHA Nation's regulatory jurisdiction under the Second *Montana* Exception.

Despite express acknowledgment that the United States was the Tribe's trustee and that BLM was agency of the trustee which was responsible for considering and enforcing the MHA Nation's setback law, BLM skirted its responsibilities to protect the jurisdiction of the MHA

Nation. Simply put, the BLM failed to properly consider the MHA Nation's jurisdiction to enforce its setback law to ensure its trust resources were protected.

The record makes clear that not only was BLM aware of the MHA Nation's setback law and assertion of jurisdiction over the Project, but that BLM employees repeatedly expressed concerns regarding the approval of the permits without complying with the tribal law. For example, as early as July 13, 2016, BLM recognized that it had the "lead role" in applying the MHA Nation's setback law in situations like the Project that deal with fee-fee-fed surface locations. BLM-002155-56.  Other internal BLM communications express concern regarding the agency's approval of the Project without a variance under the Act. AR-010959 ("I don't know how we could issue a decision on these wells without approaching the MHA Nation for a waver (sic) to the resolution."); AR-010960 ("Without a waiver I don't see how the BLM could approve it.").

Perhaps the most significant acknowledgement of the MHA Nation's assertion of jurisdiction comes from a September 21, 2016 communication which explains the BLM's "great deal of concern" regarding the location of the well and the resulting jurisdictional issues presented by the Project. AR-010962.  The communication discusses the conflict between the MHA Nation's assertion of jurisdiction and assurances related to the granting of a variance from the setback and Slawson's recalcitrance to obtaining said variance.  *Id.*  The communication goes on to outline approval options the agency was contemplating, including refusing to approve the permits until Slawson obtained a variance from the MHA Nation or BLM obtaining a variance directly from the MHA Nation under "the guise" of government-to-government consolation. *Id.* This and other communications show that BLM understood their duty to analyze and apply the MHA Nation's setback law despite Slawson's continued resistance. AR-010970 ("The MHA Nation has made it clear that variances are very often authorized by proponent must go through the proper procedure

to obtain the variance which Slawson is opposed to doing...Todd [Slawson] made very clear that he just wants his day in court to challenge the variance.").

The BLM's faulty consideration of the MHA Nation's regulatory jurisdiction over the Project came to a head on January 25, 2017, when the Acting Associate State Director expressed concern regarding a provision in the draft Finding of No Significant Impact ("FONSI") that stated the approval of the project would not violate tribal law. He wrote, "I think this is a problem.  How can we say the decision does not violate a Tribal law imposed to protect the environment?"  AR-010978.  The record shows BLM wanted to approve the project, but it could not find a legal basis for not requiring compliance with the MHA setback law

This was a true dilemma: there were two options.  When faced with that dilemma, BLM committed an error, that now requires reversal:  BLM claimed that there was a third option, that it could avoid analyzing the MHA Nation's inherent jurisdiction over the project by including a "Condition of Approval" establishing "it is the responsibility of the operator to obtain all necessary permits and to comply with all applicable federal, state, and tribal laws, rules, policies, regulations, and agreements." AR-010979

Instead of deciding, BIA threw up its hands.  The Court must remand to require BIA to decide.  Instead of engaging in a considered factual analysis to assess the MHA Nation's authority over the project under *Montana's* recognition of inherent tribal authority, the BLM abdicated its duties as a trustee by including a bureaucratically convenient condition of approval passing their the responsibility to comply with tribal law onto Slawson.  As a result of BLM's arbitrary failure to consider whether the MHA Nation had jurisdiction over the Project the Environmental Assessment, Decision Record, and FONSI all contain the hollow condition of approval formulated by BLM to avoid its responsibility. "AR-006378; AR-006513; AR-006512.

Although the tribal setback issue was a major issue before the Agency, the Decision Record only euphemistically notes the issue: "Comments were received regarding the applicability of tribal resolutions for setbacks from the lake…"  AR-006514.  The Decision Record does not comply with the Agency's duty to provide the agency analysis of on the issue.  Instead it states in conclusory language" "the above factors…were carefully considered and evaluated."  The FONSI contains a claim equally vague and unsupported by the record in finding "the Project does not violate any known Federal, State, Local or Tribal law or requirement imposed for the protection of the environment."  AR-006512.

These statements in the Decision Record and FONSI are demonstrably false and are in no way supported by the evidence in the record.  BLM knew about the MHA Nation's setback law and assertion of jurisdiction over the project.  The record show that throughout their review, BLM understood that the law posed an obstacle to their approval of the Project's ADPs.  However, in the end BLM failed to make a decision as to the Tribe's regulatory authority over the project under the *Montana* exceptions.  Instead, BLM opted to adopt a meaningless condition of approval which purportedly required Slawson, who the agency knew had vehemently objected to the application of the Nation's law, to obtain the necessary variance.

The BLM ignored and violated its duties to the MHA Nation, and as a result, failed to consider the MHA Nation's jurisdiction, and thus the application of its duly enacted law in violation of the APA.  Furthermore, this behavior will continue, time and again, absent judicial interference because as the BLM noted, this review serves as precedent for future permitting near Lake Sakakawea. AR-010962 ("This is the first well pad of four new well pad locations that Slawson is proposing within ½ mile of the lake.  Obviously how I handle this first case will set the precedent for future well locations.").  This is particularly true give that the record shows that only

two months after approving the Project's ADPs, the Slawson began "leaning" on BLM to process additional permits which would purportedly be subject reviews that are "minimal and tiered off the Torpedo EA." AR-002143. Such neglect will have devastating consequences on the MHA Nation because uniquely tribal interests, such as water rights and cultural resources, are not accounted for in agency decision-making.

"An agency action is arbitrary and capricious where the agency has 'entirely failed to consider an important aspect of the problem' . . . ." *United Keetoowah Band of Cherokee Indians*, 933 F.3d 728, 738 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43). In addition, an "[a]gencies' obligation to engage in 'reasoned decisionmaking' means that '[n]ot only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.'" *United Keetoowah Band*, 933 F.3d at 738 (quoting *Michigan v. Envt'l Protection Agency*, 135 S.Ct. 2699, 2706 (2015)). In failing to consider the extent of the MHA Nation's jurisdiction, the Corps neglected to consider an important aspect of the problem – namely, impacts of its decision on the MHA Nation's jurisdiction and water rights. The Corps' decision was therefore arbitrary and capricious. *Id.* It is neither logical nor rational to willfully ignore applicable tribal law.

## II.   BLM Acted Arbitrarily, Capriciously, and Not in Accordance with the Law in BLM incorrectly applying Instruction Memorandum 2009-078.

Independent from the discussion above, this Court must reverse the appealed decision because BLM plainly did not consider the factors it was required to consider based upon Instruction Memorandum No 2009-078 ("IM 2009-078"). The "fighting issue" is whether the Agency analyzed under the incorrect "situation." If it did, reversal is required. The manual sets forth the policy and procedure "for processing Federal Applications for Permit to Drill (ADP) for directional drilling into federal mineral estates from multiple-well pads on non-Federal locations."

AR-005245-5246.  It therefore governed the BLM's review under the National Environmental Policy Act ("NEPA") and other federal laws in the decision to grant the Project's ADPs.  The manual defines three "situations," and then states the different factors the Agency is required to consider under each of those situation.  The Tribe's position is that BLM should have analyzed under situation 3.  As is undisputable, the analysis under situation 3 is much more rigorous than situation 2.  The BLM admits it analyzed under situation 2, and it did not consider many of the factors it would have been required to consider before granting an ADP in situation 3.

The Agency analyzed under the wrong situation, and therefore reversal is required. The first of the three situation described in the manual applies to existing oil and gas well pads and does not apply here.  AR-005245-5246.  Situations 2 and 3 apply to new oil and gas well pads and their purpose is made clear by their names:

> "Situation 2: Proposed Surface Well Pad Where Surface Location is Not Determined by Access to the Federal Oil and Gas"
> "Situation 3: Proposed Surface Well Pad Where Surface Location is Determined by Downhole Location of Proposed Federal Wells"

AR-005246-5247.  The primary difference between Situations 2 and 3 is the extent of BLM's authority over surface activities on non-federal lands. If the well pad location is selected to access the federal minerals, then "[u]nlike in situations 1 and 2, above, in this situation the location of the well pad is an indirect effect of the approval of the Federal APD."  AR-005247.  Because the well pad is an indirect effect of approving the APD, then BLM is required to fulfill the requirements of federal law for surface activities and conduct a NEPA analysis of the Project's surface activities including the well pad location and proximity to Lake Sakakawea.   In Situation 3, BLM was required to fully assess "the direct, indirect, and cumulative effects of siting and construction of the well pad and adjacent access road, utilities, pipelines, and other related activities, such as drilling, operation, and plugging of the wells, as well as reclamation of the site."  AR-005244.

25

This would have required BLM to assess the impact that approval of the APDs would have on tribal and federal lake setback laws and their role in protecting the waters of Lake Sakakawea.

Situation 3 is applicable in this case because, as both Slawson and BLM admitted during administrative review, the surface location selected by Slawson for its well pad was determined by the downhole location of the proposed federal wells. That is, in fact, why BLM and Slawson wanted the well pad location was placed dangerously close to the River.  Situation 3 applies when it "is apparent that the well pad will be constructed close to the boundary of the Federal minerals to shorten the drilling distance to the Federal minerals." AR-005247.  In this case, the Project is being constructed only 600 feet from Lake Sakakawea specifically to reach the Federal minerals. As explained in the EA, BLM eliminated an alternative that would move the well pad to the north and further from Lake Sakakawea and the federal minerals leased by Slawson. BLM wrote:

> Under this alternative, some anticipated impacts of the project could be expected to be reduced; however, this alternative would not meet the purpose and need of the project in that it would not permit the proponent to fully develop the minerals located on their lease due to the technical challenges of a longer directional drilling length. Therefore this alternative was eliminated from detailed analysis.

AR-006402. In addition to this explicit recognition of the facts that required analysis under situation 3, the record further shows that the Project's final location was chose based on access to federal minerals.  Slawson's Environmental Manager discusses that the location of the well is based upon recovery of federal minerals.  AR-002513.  Specifically relevant to the application of IM 2009-078, the communication lists "impacts to drilling will increase the cost of each well…" before providing the specific example of the loss of recovery and impact the move would have on the "Bandit Federal lateral." *Id.* (noting a "Loss of two completion stages" and a "4.8% of [Estimated Ultimate Recovery] lost 40,476 [Barrel of Oil] reserves)").

Because the Project was sited and constructed as close as possible to the federal minerals in order to shorten the drilling distance to access those minerals, Situation 3 applies and BLM was required to consider all the "the *direct, indirect, and cumulative effects*" associated with the Project, including its effect on Lake Sakakawea and other resources. Importantly, "[u]nlike in situations 1 and 2…in this situation the location of the well pad is an indirect effect of the approval of the Federal APD." AR-005247

BLM's erroneous decision to assess the Project under Situation 2 and not Situation 3 eliminated consideration of numerous federal lake setback requirements, including indirect and cumulative effects of siting the well pad 600 feet from Lake Sakakawea.  *See* AR-005247.  While BLM may only be approving the APD, BLM is required to consider all of the actions connected to that approval.  BLM thus made a demonstrable error of fact by applying the wrong situation under IM 2009-078 and abdicated it of its duties to analyze tribal and federal authorities requiring a 1,000-foot setback from Lake Sakakawea impacts to the human and natural environment.

BLM's cursory NEPA analysis under IM 2009-078 also resulted in an inadequate analysis in the EA and FONSI.  None of these approval documents provide a "hard look" at tribal and federal authorities requiring a 1,000-foot setback from Lake Sakakawea for the protection of surface waters as required under NEPA. *Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). Moreover, this limited NEPA review limited the MHA Nation's ability to intervene in the BLM decision-making process and provide input which only it could have related to the impact the Project would have on the Tribe's land and resources, including its treaty reserved water rights.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. CV 16-1534 (JEB), 2017 WL 2573994, at *18 (D.D.C. June 14, 2017).

When it gave up other lands but reserved its current Reservation, the MHA Nation reserved, and obtained a property right to a quantity and quality of water from the River. *See* p. 16-17, *supra*. The MHA Nation's water rights in Lake Sakakawea are fundamental to the MHA Nation's survival and well-being, and the BLM has a trust obligation to protect the MHA Nation's rights when it issues permits that affect them. *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999), as amended, 203 F.3d 1175 (9th Cir. 2000). See also *Pyramid Lake Paiute Tribe v. Morton*, 354 F. Supp. 252, 256 (D.D.C. 1972).

BLM's failure to consider the Project's potential impact on the MHA Nation's water property rights is evident when reviewing its NEPA documents. While Section 4.2 of the EA purports to discuss impacts to domestic drinking water supplies, the section never mentions the MHA Nation's drinking water intake, or other rural water intakes located in Lake Sakakawea approximately 600 feet from the Project. To find a discussion of water intakes one must go to Slawson's Oil Spill Contingency Plan, which establishes "in the event of a spill reaching Lake Sakakawea, appropriate notification would be given the City of Parshall." AR-005837; AR-002778. Put into context, the BLM permitted a commercial oil and gas project within 600 feet of Lake Sakakawea, the MHA Nation's, without requiring, let along considering whether to require the company to notify the MHA Nation when an oil spill reaches the Lake.

The only reference remotely touching on the MHA Nation in the EA's water resources discussion is a passing reference to the pending application with the EPA for treatment as States status for federally approved water quality. AR-006417. Section 4.6.2.7's review of environmental justice is also absent of any discussion related to the MHA Nation's cultural connection to the waters of the Missouri River or the MHA Nation's reserved waters rights.

More analysis is needed by BLM when a Project would violate numerous tribal and federal setback requirements, affect tribal treaty resources and property, and set a precedent for oil and gas drilling on the shores of Lake Sakakawea.  BLM's incorrect application of IM 2009-078 and subsequent failure to consider the indirect and cumulative effects of Slawson's well pad siting means the agency's analysis of the APDs was done without addressing the full breadth of potential impacts from the Project.  As such, BLM's analysis of Slawson's APDs was inadequate and the decision  approving the APDs in question failed to consider all relevant factors.  BLM entirely failed to consider an important aspect of the Project, namely its location a mere 600 feet from Lake Sakakawea, and the agency's decision is therefore arbitrary and capricious.  The Permit must be vacated and the matter remanded with instructions to consider under the more protective standards under Situation 3.

III.    **BLM Acted Arbitrarily, Capriciously, and Not in Accordance with the Law in failing to apply their own and other various federal agencies' setback requirements.**

Due to BLM's error in applying IM 2009-078, and subsequent inadequate NEPA analysis, the agency did not assess the Project's failure to comply with numerous federal setback requirements for oil and gas activities near Lake Sakakawea.  As shown below, a minimum 1,000-foot setback requirement is the standard safety measure that has been adopted by all federal agencies involved in oil and gas development near Lake Sakakawea.

A.    **BLM was Required to Apply Its North Dakota Resource Management Plan Setback Requirements.**

BLM's 1988 North Dakota Resource Management Plan (RMP) "provides a single comprehensive land use plan *for all BLM resource management responsibilities in the state*." AR-007473 (emphasis added).  It thus applies to BLM's management of lands and minerals on Fort Berthold Reservation, and to the APDs approved by BLM in this case.  Appendix D-2 of the RMP

contains "Oil and Gas Lease Stipulations" for oil and gas development in "special areas." "[S]pecial areas" include areas that are within "1,000 feet … from larger perennial streams, rivers, and domestic water supplies."  *Id.*  When leases are proposed within 1,000 feet of these water sources, such as Lake Sakakawea, BLM's RMP requires that leasing "will be strictly controlled, or if absolutely necessary, excluded" "to prevent damage to surface and/or other resources."  *Id.* The RMP provision for strict control or prohibition, described above, applies to the development of federal minerals and the federal actions at issue in the instant matter.

Enforcement of BLM's setback requirement in this case is consistent with the cooperative management required by the RMP, which requires cooperative management of federal lands and minerals with other federal agencies and the MHA Nation.  In implementing the RMP, BLM is required to "[c]ontinuously evaluate consistency with approved plans or programs of other federal agencies, state and local governments or Indian Tribes."  AR-007475.  Similarly, the RMP requires that BLM provide for the development of oil and gas resources "while avoiding unnecessary impacts to other resources and land uses."  AR-007476.

The RMP also specifically requires that BLM protect the cultural values of the River and its waters.  AR-07477.  The RMP requires BLM "to manage cultural resources so scientific and socio-cultural values are not diminished, but rather maintained and enhanced" and ensure that the agency's "undertakings avoid inadvertent damage to cultural resources both federal and non-federal."  *Id.*  As discussed above, and as should be undisputed, River, Lake Sakakawea, and the waters therein are "cultural resources" and the MHA Nation.  *See also*; AR-007481. Finally, the RMP requires "[c]oordination with Indian tribes on Bureau actions that potentially disturb currently used and formerly used sacred areas and/or sites."  AR-007478.  This requirement of the

RMP is consistent with the federal government's trust obligation "to protect the interests of Indian tribes, including protecting tribal property and jurisdiction." *HRI, Inc.*, 198 F.3d, at 1245.

Under the RMP, BLM was required to take action to uphold its trust obligation to the MHA and enforce the MHA Nation's setback requirement, or, at the very least, comply with the agency's own resource management plan. Because it failed to do so, its approval of the Project's APDs was arbitrary, capricious, and contrary to the law, and must be overturned.

## B. BLM was Required to apply BIA and FWS Endangered Species Act Lake Setback Requirements.

The Bureau of Indian Affairs ("BIA") prepared a *Programmatic Biological Assessment and Biological Evaluation for Fort Berthold Indian Reservation Oil and Gas Development* ("Programmatic BA/BE") to comply with the Endangered Species Act, 16 U.S.C. §§ 1531 et seq., ("ESA") for oil and gas development on the Fort Berthold Indian Reservation. AR-007455-7447. The Programmatic BA/BE applies to the entire Reservation, including the Project and the APDs at issue in this case. AR-007452; ("[t]he Project Area for the Proposed Action [assessed in the Programmatic BA/BE] is the entire FBIR [or Fort Berthold Indian Reservation]. … The FBIR encompasses approximately 1 million acres, of which almost half is held in trust by the United States (U.S.) for either the MHA Nation or individual Native Americans (known as allottees)."

In assessing the effects of oil and gas development on threatened and endangered species, BIA correctly found Lake Sakakawea as a sensitive and very sensitive water resource.  AR-007477; AR-007453-7454.  To protect Lake Sakakawea, BIA included a minimum 1,000-foot setback as both a general and specific requirement. BIA included the setback as a general "conservation and minimization" measure to "eliminate or reduce the potential for effects to some or all of the listed species."  AR-007450-7451.  BIA also included the setback requirement in its Conditions of Approval set out in Appendix A of Programmatic BA/BE. AR-007456.

The Fish and Wildlife Service ("FWS") subsequently concurred with the Programmatic BA/BE, and in doing so reached the same conclusion as the BIA and MHA Nation regarding the need for a minimum 1,000-foot setback for oil and gas development around Lake Sakakawea.  AR-007451; AR-007462-7466.  FWS's concurrence was based in part on BIA's comprehensive analysis of spill incident data on the Reservation and the determination that *a minimum 1,000-foot setback* from Lake Sakakawea are needed to protect Lake Sakakawea and provide an effective response time in the case of a spill.  AR-007448-7451; AR-007458-7460.

While the BLM did receive a letter from FWS concurring with the mitigation measures adopted in the EA, AR-003065-66, the FWS concurrence does not specifically address the 1,000-foot setback requirement.  Satisfied that design features and best management practices discussed in the EA would mitigate any potential adverse impacts to Lake Sakakawea, the record shows BLM's decision fails to mention, let alone address the Programmatic BA/BE or its reasoning for the setback, thus fails to consider the potential impacts of violating the 1,000-foot setback.  BLM's failure to consider these impacts, and instead rely on FWS ESA concurrence, renders BLM's analysis inadequate and incomplete, and therefore its decision to approve Slawson's APDs was arbitrary, capricious, and not in accordance with law.

### C. BLM was Required to apply the Army Corps of Engineers Setback Requirements.

In addition to the MHA Nation, BIA, FWS, and BLM, the Army Corps is the fourth entity that has determined that oil and gas activities should be setback from Lake Sakakawea.  In December 2013, the Army Corps issued its *Garrison Project-Lake Sakakawea Oil and Gas Management Plan* ("Army Corps Plan") to "ensure that proposed oil and gas exploration, development, production and rehabilitation projects do not unreasonably impact the surface estate and subsurface estate of the Garrison Project, including associated natural, cultural,

32

socioeconomic, and aesthetic resources for statutorily authorized project purposes."  AR-007542. The Army Corps Plan applies to federal, state, and private real estate and minerals located in the Garrison Project.  AR-007541-7547.

The Army Corps Plan defines that for projects "[w]ithin 0.25 miles of surface water and/or riparian areas" "[a]ny surface use or occupancy … will be strictly controlled or, if necessary, prohibited."  AR-007546. The Army Corps had authority to consider waivers of that setback, AR-007547, and BLM's approval of Slawson's APDs required written approval from the Army Corps' Authorized Officer, but no approval was received.  Slawson should have obtained an appropriate exception from the Army Corps to be within a quarter mile of Lake Sakakawea, but no closer than the 1,000-foot setback required by the MHA Nation, BIA, FWS and BLM.

The Army Corps review of the Project was also limited by BLM's cursory NEPA analysis under the improper application of IM 2009-078.  In email correspondence the Army Corps sought discussion of the MHA Nation's setback requirements for Lake Sakakawea in the EA writing that they "have serious concerns regarding this location" and want to discuss "mitigation that is being crafted into the EA."  AR-007098.  These setback requirements never made it into the EA. The EA is also void of any discussion of the lease stipulations included by the Army Corps in the lease issued by BLM to Slawson for oil and gas activities near Lake Sakakawea.  BLM-ND-SLAWSON-007551-7566. Because of these failures, BLM's approval of the Project's APDs was arbitrary, capricious, and contrary to the law, and must be overturned.

**IV.    The decision must be vacated because the Director's failure to keep records results in the Director not being able to properly certify the documents in the administrative record before her.**

In its prior briefing to this Court, the MHA Nation explained that the Director's office had simply failed to keep the log of documents from which it could certify the administrative record.

Based upon that briefing, this Court ordered the Agency to re-certify the administrative record. On December 2, 2019, the Agency filed its responsive to the Court's order. The documents include a declaration by an employee in the Director's office and a declaration by an Agency employee. Those declarations simply do not cure the problem that resulted in this Court's prior order. Most significantly, the declaration from the Director's office regarding documents in the IBIA file does not claim to be based upon personal knowledge, and we know based upon that same declarant's prior declaration that the new declaration is, in relevant part, not based upon personal knowledge. Simply put, the Director's office previously admitted it did not retain the documents or a log of the documents that were before the Director, and it therefore cannot, and has not, provided the required certification. Akin to a "chain of custody" issue, there is a step missing. The Director's office guesses that the documents that it did not retain were all of those documents that were in the IBIA file, which it guesses were all the documents the agency had sent to the IBIA; but a "certified" guess is not sufficient. The consequence is reversal and remand.

## V.   The Director abused their discretion by assuming jurisdiction over the appeal before the Board and issuing a decision without analysis of the merits of the appeal.

On October 2, 2017, while this Court's decision on Slawson's TRO was still pending, BLM filed a Petition requesting the Director of OHA to review and invalidate the Board's stay order, take jurisdiction over the administrative appeal, and render a final decision on the matter. AR-009353-9380. On October 10, 2017, Slawson filed its own request for Director Review, which sought the same action as BLM's Petition. AR-007667-7680. Without providing the MHA Nation notice and an opportunity to be heard, and despite more than twenty years of precedent limiting the use of the Director's sparingly used review authority to extraordinary circumstances or errors, the Director granted BLM's Petition and Slawson's request, and assumed jurisdiction. AR-

34

009052-9054.  On October 17, 2017, the MHA Nation requested reconsideration of the Director's assumption of jurisdiction.  It asserted denial of its due process right to notice and an opportunity to be heard and that Departmental regulation 43 C.F.R. § 4.28 prohibiting review of interlocutory appeals of ruling like the temporary stay order issued by the Board.  AR-009000-9020.

On March 22, 2018, the Director issued a Decision in the appeal, which found the Board's stay order was in error, affirmed the BLM's DR/FONSI approving the APDs, and denied the MHA Nation's request for reconsideration.  AR-008326-8335.  The Director's Decision found the Board's stay order invalid based solely on a disagreement with the Board's application of its own precedent and the resulting determination that the appeal raised multiple legal issues of first impression that could only be properly addressed after a thorough review of applicable law and precedent warranted a stay.  AR-008326-8329.  The Director took this position despite acknowledging that the stay related filings contained challenging components and complex legal issues that are not regularly before the Board, the Project contained unique technical complexity, and that an Intervener's participation places additional information, arguments, and thus consideration before the Board.  AR-008329.

The Director's Decision went on to discuss at great length issues outside the merits of the appeal, such as the Director's perception that the Board did not adequately consult legal authority from a different OHA appeals board and the Director's administrative complaints regarding the timing of the issuance of the Board's stay order, even though the stay order was properly issued according to long-standing precedent of the OHA Director.  AR-008330-008333.  In contrast to the considerable discussion on these non-merit issues, in affirming the BLM Field Office's DR/FONSI the Director's Decision failed to substantively address or analyze any of the merits of the MHA Nation's appeal.  AR-00833-00835.  Instead, the Decision simply cites to this Court's

vacated November 27, 2017 order granting a preliminary injunction of the Board's stay order to support its affirmance of the DR/FONSI.  *Id.*  The Director's Decision offered no support for its reliance on the District Court's interlocutory order in affirming the BLM's DR/FONSI and allowing Slawson to continue construction and operation of its oil and gas wells outside of the Director's belief that the issue before the court overlapped with those in the MHA Nation's appeal.

The Director's Decision in this matter was premature, as briefing was ongoing, and the Board's stay order was temporary.  Additionally, while the Director's assumption of jurisdiction in the matter was discretionary, review authority is frequently limited to extraordinary circumstances or errors.  There were no extraordinary circumstances or errors in the MHA Nation's appeal before the Board.  In fact, while the Board had issued a temporary stay order, the matter had not been fully briefed by all parties sufficient to create extraordinary circumstances.  The Director abused their discretion in assuming jurisdiction over an ongoing matter before the Board and in issuing a decision without addressing the merits of the MHA Nation's appeal.  Because the Director abused their discretion, this Court should vacate the Director's Decision, and reinstitute the Board's stay order.

### CONCLUSION & PRAYER FOR RELIEF

The Director's invalidation of the Board's stay order and approval of BLM's issuance of Slawson's APDs despite its failure to consider or apply a minimum 1,000-foot setback from Lake Sakakawea was arbitrary, capricious, and not in accordance with the law.  BLM's decision, and the Director's subsequent approval, failed to consider all the relevant factors in evaluating environmental impacts to Lake Sakakawea that may result from the Project, including the setback requirements of the MHA Nation, BIA, FWS, Army Corps.  The BLM's decision to willfully ignore applicable federal setback requirements, including its own, created a jurisdiction vacuum

by which they were able to approve a commercial oil and gas well a mere 600 feet from Lake Sakakawea. It is for this exact reason that the MHA Nation exercised its inherent authority recognized by the Supreme Court and enacted its own setback requirement to protect its membership, land, and water. Unfortunately, the BLM's malfeasance meant that the MHA Nation's law was also disregarded.

The APA directs that federal agencies shall "hold unlawful and set aside" agency action found to be arbitrary, capricious, or contrary to law. 5 U.S.C. § 706; *FCC v. NextWave Personal Communications, Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act requires federal courts to set aside federal agency action that is 'not in accordance with law'") (emphasis added); After finding an agency action unlawful pursuant to APA review, "an appellant…is entitled to relief under that statute, which normally will be a vacatur of the agency's order." *Iowa League of Cities v. EPA,* 711 F.3d 844, 878 (8th Cir. 2013) (vacating agency rule for violation of the APA); *Diné Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) (vacating drilling approvals without NEPA and NHPA compliance); *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001).

Vacatur is the appropriate remedy in this instance. This is particularly so as the unlawful agency decision-making process led to approvals that are resulting in immediate on-the-ground harm to the MHA Nation's interests and set precedent for the permitting of oil and gas elsewhere within the boundaries of the Forth Berthold Reservation and near the edge of Lake Sakakawea. Vacating permits is the standard remedy in environmental claims brought pursuant to the APA.

For the forgoing reasons, the MHA Nation respectfully requests that this Court grant its summary judgement motion, order the BLM to prepare a full EIS that considers the MHA Nation's jurisdiction and water rights, and vacate the underling permits for Slawson's project.

Respectfully submitted this 14th day of February, 2020.

**FREDERICKS PEEBLES & PATTERSON LLP**

*/s/ Jeffrey S. Rasmussen*
Jeffrey S. Rasmussen
1900 Plaza Drive
Louisville, CO  80027
Phone: 303.673.9600
Facsimile: 303.673.9155
Email: jrasmussen@ndnlaw.com

*Attorney for Plaintiff*